**AMP INCORPORATED, Plaintiff,**

v.

**BURNDY OF MIDWEST, INC.,**
**Defendant.**

**No. 71 C 1342.**

United States District Court,
N. D. Illinois, E. D.

Dec. 27, 1971.

Fitch, Even, Tabin & Luedeka, Chicago, Ill., Curtis, Morris & Safford, New York City, for plaintiff.

Pendleton, Neuman, Williams & Anderson, Chicago, Ill., for defendant.

### MEMORANDUM OPINION AND ORDER

PARSONS, District Judge.

AMP Incorporated (AMP), a New Jersey corporation with principal place of business in Harrisburg, Pennsylvania, and plaintiff in this action for patent infringement, vigorously opposes a 28 U.S.C. § 1404(a) motion by Burndy of Midwest, Inc. (Midwest), an Illinois corporation, to transfer this cause to the Federal District Court of Connecticut, notwithstanding the fact that, not less than twelve months ago, AMP, itself, in a similar transfer motion, successfully prevailed upon an Illinois Federal District Court Judge to transfer an action in which it was the defendant[1] from this forum to the Middle District Court of Pennsylvania, at Harrisburg, on the twofold ground of convenience of the parties and witnesses and in the interest of justice.

The Midwest § 1404(a) transfer motion presents two threshold questions: First, could the action have been brought originally in the District Court of Connecticut at Norwalk, and secondly, will the transfer be for the convenience of the parties and witnesses and in the interest of justice? The Court will analyze the questions in seriatim.

Venue for patent infringement cases is governed by 28 U.S.C. § 1400(b), Fourco Glass Co. v. Transmirra Products Corp., 353 U.S. 222, 77 S.Ct. 787, 1 L.Ed.2d 786 (1957), which states:

> "Any civil action for patent infringement may be brought in the judicial district where the defendant resides, or where the defendant has committed acts of infringement and has a regular and established place of business."

■ The residence of a corporation under § 1400(b) refers solely to the state of incorporation. Fourco Glass Co. v. Transmirra Products Corp., *supra.* Incorporation being in the State of Illinois, residence for Midwest is likewise the State of Illinois. This being so, in order for the Norwalk, Connecticut judicial forum to entertain this action, Midwest must be found to have committed acts of infringement and have a regular and established place of business in Norwalk.

Determining whether Midwest has a regular and established Norwalk place of business is made difficult by the fact that the Norwalk-Midwest existence is interwoven with that of the parent corporation, Burndy, a New York corporation having its principal offices and plant facilities in Norwalk, and who is also the antagonist *sub rosa* in this litigation. The Burndy practice of having the first appellative for the twelve wholly owned sales subsidiaries the same as that of the parent corporation further adds to the difficulty. An examination

---

1. AMP's 28 U.S.C. § 1404(a) motion was made in the proceeding of Molex Products

Co. v. AMP Incorporated, 168 U.S.P.Q. 78.

of the facts surrounding the dual existence of Midwest follows.

Acting solely as a sales conduit, the Chicago-Midwest office promotes, demonstrates, and leases Burndy products, employs five salesmen and two clerks, and maintains a petty cash bank account. This is the total factual indicia of its Chicago existence. It has no production, assembly, design or other technical facilities or capabilities in the State of Illinois. Moreover, the allegedly infringing devices were conceived, designed, developed, manufactured and assembled by Burndy in Norwalk.

The Midwest nerve center from which all stimuli emanates is the principal office in Norwalk. The control, management, guidance and direction all flow from Midwest corporate officials and directors located in Norwalk—said officials and directors being for the most part the same persons who act as the corporate officials and directors for Burndy. The offices that said Midwest and Burndy corporate personnel occupy are one and the same. Even so, Midwest pays rental fees to Burndy for office space. The salaries paid said officers and directors is chargeable to Midwest. All Midwest director meetings are held in Norwalk. The hiring of Chicago-Midwest salesmen and their salary determinations are handled by Midwest corporate officials and directors.

Customer lease agreements are prepared by the Norwalk-Midwest office and the customers lease directly from it. Where machines are leased directly to the customer, title thereto is passed from Burndy to Midwest at Norwalk. Midwest pays an annual $100.00 to-do-business license fee to the State of Connecticut.

Chicago-Midwest remittances are sent to a New York lock box to which only Norwalk personnel have access. Midwest books of accounting, balance sheets, and all manner of financial records are kept by the Norwalk branch. Service fees are charged Midwest for all services, e.g., receiving orders, delivering merchandise, and invoicing purchases, performed regularly and systematically by Burndy personnel on behalf of Midwest. When customer purchase orders are sent to the Chicago-Midwest office, they are forwarded to the Norwalk-Midwest office for acknowledgment and acceptance, since only the Norwalk office has the authority to accept and approve orders. Burndy manufactured products are then shipped F.O.B. Norwalk, Connecticut, directly to the customers.

All Chicago-Midwest purchase orders are premised on quotations issued from Norwalk. The quotations determine (1) the equipment which is available for sale, and (2) the selling price. At the Norwalk office only the name "Burndy", the common appellative to the parent and all the sales subsidiaries, appears on the building. Nonetheless, Midwest mail received at Norwalk is appropriately routed to Midwest-Burndy offices within the Burndy building, and the same holds true for telephonic correspondence, even though Midwest is not listed in a Norwalk telephone directory.

The recital of the foregoing facts reveals that Chicago-Midwest performs a minor role as regional sales office soliciting orders, while Norwalk-Midwest performs a major role as corporate headquarters wherein the sales acceptance, processing, invoicing and other related functions are performed. It is apparent that without the Norwalk-Midwest branch, Chicago-Midwest would be stripped of its functioning ability. Norwalk is the brain, Chicago the muscle. Chicago-Midwest transmits impulses to the Norwalk-Midwest nerve center wherein occur the appropriate reactions.

The Court finds that Midwest has a dual business existence—one comprises the systematic and continuous Burndy product solicitation and demonstration in Chicago, and the other comprises the significant, substantial and permanent managerial and operational hub of activity in Norwalk. Having found from a review of the facts that Midwest has a regular and established place of business in Norwalk, the Court must next determine whether Midwest

committed any acts of infringement in Norwalk.

■■ In determining whether certain conduct within a district is sufficient to constitute acts of infringement for purposes of establishing venue in patent infringement actions, the Seventh Circuit no longer rigidly adheres to the technicalities of commercial sales law—namely, that a completed sale is deemed made in the state of acceptance. Union Asbestos & Rubber Co. v. Evans Products Co., 328 F.2d 949 (1964). Just as the greater always includes the lesser, so the recent criteria broadening of what constitutes sufficient acts of infringement includes the aged restrictive requirement of a completed sale. Consummation of sales and leases, i.e., their acceptance and approval by the Norwalk Midwest office, constitutes an act of infringement permitting suit to be brought against Midwest in Norwalk.

Having found that Midwest has a regular and established Norwalk place of business, and has committed acts of infringement in Norwalk, the Court must next determine whether a transfer would be for the convenience of the parties and witnesses and in the interest of justice. The salient factors which a court should consider when passing on this issue were articulated by the Supreme Court in Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508, 67 S.Ct. 839, 843, 91 L.Ed. 1055 (1947):

" . . . [A]n interest to be considered, and the one likely to be most pressed, is the private interest of the litigant. Important considerations are the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive. "Factors . . . of public interest also have place in applying the doctrine. Administrative difficulties follow the courts when litigation is piled up in congested centers instead of being handled at its origin. . . . "

AMP, a New Jersey corporation having its principal executive offices, research and development facilities and manufacturing operations located in Harrisburg, Pennsylvania, has chosen to file suit in an alien forum, six hundred miles from Harrisburg, in which it previously had moved to transfer out, and in view of the fact that one of the twelve wholly owned Burndy sales subsidiaries, functioning much the same as Chicago-Midwest, is located in King of Prussia, Pennsylvania.

AMP, as well as Midwest, has chosen to retain a New York law firm as its principal counsel and a Chicago law firm as its local counsel. Local Chicago counsel must constantly confer with principal counsel in whom is vested the sole authority for making major decisions. Thus, it becomes more readily apparent that the heart of this action centers around New York City, since both Harrisburg and Norwalk are much closer to it than is Chicago.

■ It must be remembered that Congress contemplated a venue where there would be firsthand visual and audible knowledge of the conditions, the environment and the art itself, and testimony of the most competent witnesses. Vibber v. United States Rubber Co., 255 F.Supp. 47 (D.C.N.Y.1966). In light of the systematic and permanent nature of the aforedescribed Norwalk merchantry activity, which comprises the decision-making function of accepting and approving sales and leases and the related ministerial functions of drafting sale and lease agreements, receiving purchase orders, delivering merchandise, and invoicing purchases, the proper battleground upon which to launch the AMP offensive is Norwalk, or, at the very least, Harrisburg.

It is in Norwalk where all of the Midwest books, records, balance sheets, etc., are kept. As previously noted, it is in Norwalk where the allegedly infringing devices were conceived, designed, devel-

oped, manufactured, assembled and stored by Burndy. The trier of fact ought to be as close as possible to the milieu of the infringing device and the hub of activity centered around its production. A Norwalk trier of fact would have easier access to the visual and audible knowledge described earlier than a Chicago trier of fact. It would also be in the best interest of local counsel, since neither can make any major decisions without first conferring with principal counsel in New York.

Accordingly, it hereby is adjudged, ordered and decreed that the motion of defendant Burndy of Midwest, Inc., to transfer this cause to the District Court of Connecticut at Norwalk is granted. The Midwest motion to stay is rendered moot by this order.